**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

_____

BENJAMIN LEVINE,                          :

     Plaintiff,                          :

v.                                        :

STATE OF NEW JERSEY; FRANK                :
GRAVES, ESQ.; NANCY HULETT,               :
ESQ.; CORA STENGER CASHMAN,               :
INVESTIGATOR; INVESTIGATOR SUSAN          :
EVANS; AND SANDRA Y. DICK, ESQ.           :
                                          :
     Defendants.                         :
_____

2019 OCT -7  P 2 14

CIVIL ACTION

Case Number _____

REMOVAL OF A CRIMINAL CASE

FROM STATE COURT

## PARTIES

BENJAMIN LEVINE, PLAINTIFF
12 TUTOR PLACE
EAST BRUNSWICK, NEW JERSEY  08816
mkmaven2@gmail.com
(732) 254-3556

Plaintiff was falsely accused of 4th degree criminal sexual contact during an examination of nine (9) women and convicted of nine counts in 1996 after a hung jury trial in 1994.  Plaintiff was acquitted of one count of 2nd degree penetration in 1994.  In 2009 at a third trial the jury acquitted plaintiff of three (3) counts of the 1996 conviction, when the three women demonstrated the physically impossible alleged sexual contact.  However, the defense lawyer failed to obtain the 2009 trial transcripts that acquitted in less than one (1) hour.  A conspiracy seeking millions was discovered during the appeal related to the false memory loss syndrome.  The false memory loss of 18 months was not reviewed by the State Appellate Court claiming the fact was barred by not being raised in prior proceedings.  The 18 month false memory loss allowed seven (7) more women to make complaints, as not one woman made a claim until all made visits to make sure plaintiff's office was not closed.  A lawyer wanted seven (7) women to support her client to make sure she would obtain millions in awards.  Plaintiff's State remedies were exhausted by two (2) denied Post-Conviction Relief Petitions.

FRANK GRAVES, ESQ., ASSISTANT PROSECUTOR FOR THE STATE
25 KIRKPATRICK STREET     3RD FLOOR
NEW BRUNSWICK, NEW JERSEY  08901
(732) 745-3300

Defendant Frank Graves, Esq. needed all the elements of the
alleged crime.  He coached a motivated Sheri Perl to claim she
was not sure she was abused.  He coached her to say she hid in
the dressing cubicle to see what Levine was doing to prove she
was abused.  She falsely used the mirror to see Levine at the
sink, saying he was not washing his hands.  Her testimony was
that Levine was performing self-gratification, as she could see
his side.  She also claimed she saw a white dot on the sink.
From the State's drawing of the scene, the mirror and the sink,
it was obvious that Ms. Perl could not see the sink or Levine.
Mr. Graves sent Investigator Cora Stenger Cashman to verify the
testimony of Ms. Perl.  With plaintiff present Ms. Cashman could
not verify Ms. Perl's testimony proving she was coached to lie.
Mr. Graves withheld that exculpatory search from the court and
jury! That **Brady v. Maryland** violation was ignored by the court!

NANCY HULETT, ASSISTANT PROSECUTOR FOR THE STATE
25 KIRKPATRICK STREET     3RD FLOOR
NEW BRUNSWICK, NEW JERSEY  08901
(732) 745-3300

Defendant Nancy Hulett and the prosecutor's office refused to
produce three (3) exculpatory documents and the results of an
exculpatory search proving the alleged victims lied.  Although
the lower PCR court ordered the release of the exculpatory
documents, the prosecutor's office refused to produce them.  The
State lower courts and the State Appellate Courts do not believe
the United States' Constitution's Supremacy Clause of the United
States Supreme Court's ruling in **Brady v. Maryland, 373 U.S. 83
(1963)**.  The Rule Of Law does not exist in the State.

CORA STENGER CASHMAN, INVESTIGATOR
1631 TUGWELL STREET, SE  #3
PALM BAY, FLORIDA  32909

Defendant Cora Cashman along with Susan Evans performed a search
of the crime scene to verify the testimony of an alleged victim
while plaintiff was present.  The testimony of the alleged
victim could not be verified, yet, Ms. Cashman refused to reveal
such to the jury and the prosecutor refused to provide that
exculpatory fact of the alleged victim's lie.  Ms. Cashman
resigned from the prosecutor's office under unknown sexual

claims and moved to Florida.  Ms. Cashman refused to answer two
recent letters requesting her findings.

SUSAN EVANS, INVESTIGATOR FOR
THE STATE DEPARTMENT OF CONSUMER AFFAIRS
124 Halsey Street
Newark, New Jersey   07102
(973) 504-6200

Defendant Susan Evans performed a search of the crime scene to
verify the testimony of an alleged victim.  She could not do so.
But, she refused to provide the result of her search.  She then
testified at the trial that plaintiff confessed to the alleged
crime after plaintiff invoked his silence and Ms. Evans failed
to reread plaintiff's Miranda Rights in the new room.  The New
Jersey courts refused to dismiss the alleged confession of Ms.
Evans and her strange testimony that claimed plaintiff needed
help instead of plaintiff's statement that he needed legal help.
Ms. Evans destroyed her notes and misinterpreted statements.

SANDRA Y. DICK, ESQ.
THE STATE DEPARTMENT OF LAW AND PUBLIC SAFETY
124 HALSEY STREET
NEWARK, NEW JERSEY   07102
(800) 242-5846

Defendant Sandra Y. Dick, Esq. is the senior lawyer assigned to
the State Board Of Medical Examiners.  Over her many years of
service she has a reputation of withholding complaints and
evidence until the day before a hearing with the Medical Board.
Her reputation includes making false accusations against state
physicians in an attempt to convict the physician.  Ms. Dick's
major work includes reviewing physicians' applications for
malpractice insurance to find evidence of insurance fraud and
misapplication, which she uses to help a prosecutor turn a jury
against the physician.  In this matter Ms. Dick reviewed
plaintiff's malpractice insurance applications from 1992 and
1995.  Ms. Dick accused plaintiff of insurance fraud after she
found his 1992 application stated there were four malpractice
claims against him, while his 1995 application stated there were
no malpractice claims in the past five (5) years!  Ms. Dick, as
usual, failed to investigate her claim.  The malpractice insurer
filed a declaratory action in 1993 seeking a ruling that no
malpractice claims were valid.  Ms. Dick failed to know about
this action and failed to know its ruling.  The declaratory
action court ruled that criminal acts were excluded from the
malpractice policy and were not malpractice claims as no medical

wrongdoing existed.  Criminal allegations were not malpractice claims, even if the criminal claims were part of a medical event.  The women stated their medical complaints were treated properly, but the alleged sexual contact was not proper. Plaintiff's applications were truthful, as in 1992 four (4) women made malpractice claims, but by 1995 those malpractice claims were criminal claims excluded from being malpractice cases.  The women settled without receiving one penny.  The prosecutor and the judge assumed Ms. Dick was correct, as neither investigated.  The judge charged the jury stating plaintiff cannot be charged with insurance misapplication and fraud, but the jury could use that fact to determine the plaintiff's credibility.  The jury convicted, as the Public Defender was ineffective by allowing damaging false statements.

## **JURISDICTION**

Plaintiff, Benjamin Levine, seeks to overturn the nine (9) count conviction of 1996 after a 2009 jury trial acquitted him of three (3) of those counts.  Plaintiff seeks Removal From State Court of the above captioned matter that was a criminal prosecution pursuant to **Title 28, Section 1443** and **Section 1455**.

Original Jurisdiction shall also reside in the district court under **Title 28, Section 1343** to recover damages for injury to his person and because of the deprivation of rights of a citizen of the United States, and to recover damages from any person who failed to prevent any wrongs as in **Section 1985** of **Title 42**, which he had knowledge were about to occur and the power to prevent.  More specifically, plaintiff seeks to redress the deprivation, under color of State law of the right secured by the Constitution of the United States, wherein plaintiff was unjustly arrested.  He was harmed following a 1994 hung jury trial.  The jury selection in 1996 was a circus atmosphere, as county residents had been exposed to six (6) years of rumors that talked of plaintiff's guilt.  His guilt was the topic of teachers in local schools and in doctors' offices.  Rumors were spread in a beauty shop and at a church dinner.  From his arrest in 1990 and the loss of work for two years, plaintiff's guilt was discussed throughout the county, as revealed during jury selection.  Jury selection was a carnival atmosphere!

Plaintiff's right to be secure in his home was taken away by a refusal to accept the Rule Of Law, the fundamental foundation of democracy that promises freedom for an innocent accused.

As such, there exists a violation of a citizen's rights under **Title 42, U.S.C. Section 1981 et. seq.**, and more specifically, **Title 42, U.S.C. Section 1983**.

Venue exists in this district by virtue of **Title 28 U.S.C. Section 1391**.

## Trial By Jury

Under **Fed. R. Civ. P. 38(b)** this Complaint is a demand for a Trial by Jury.  Plaintiff demands the right to question the women whose claims were not physically possible and to have the women demonstrate the alleged acts, which was ignored by every defense counselor.  After eleven years of work the women gave up their malpractice civil claims for millions of dollars, as they settled the case without receiving one penny, knowing the damages trial would reveal the alleged acts were false.  The New Jersey Appellate Justices refused to accept the Supremacy Clause of the United States Constitution.  They failed to demand the exculpatory facts and documents that prove innocence.  It was a **Brady v. Maryland 373 U.S. 83 (1963)** error that must overturn the conviction without further action.  The alleged sexual contact was assumed or imagined.  A conspiracy using false memory loss allowed seven (7) more women to make false claims!

## CAUSE OF ACTION

I, Benjamin Levine, of full age, residing at 12 Tutor Place, East Brunswick, NJ. in Middlesex County, by Complaint says:

### Count I

1. Maryellen McGlynn Morris (M.M.M.) complained that she visited Benjamin Levine in 1970 when she was 12 years old and he hugged her and she felt a penis through clothing, as she had brothers who had done similar acts.  M.M.M. spread rumors telling her sister, friends, another doctor and others that she was abused by Levine at age 12.

2.  M.M.M. became part of a conspiracy begun by Ann Renaud, Esq. who was eager to claim millions in insurance claims.

3.  M.M.M. began these false rumors in 1985 at age 24 saying she was sure the abuse was in 1970, as another event occurred at the same time.

4.  However, Levine was in the Far East with the marines during the Vietnam War and did not return until the end of 1970.

5.  He did not have an office where M.M.M. claimed she was abused until 1978 that is eight years after the claimed abuse.

6.  M.M.M. visited Levine for the first time in 1978, as the medical records reveal her only visits were in 1978, 1980 and 1983 and she said there was no abuse during those only three (3) visits, as it is obvious that M.M.M. confused Levine with her pediatrician, as she joined the conspiracy to harm Levine.

7.   The lower court judge said M.M.M. was truthful, but she confused the dates proving the judge was not only biased against Levine during M.M.M's testimony at the first Post-Conviction Relief evidentiary hearing, but he failed to have the prosecutor reveal the exculpatory documents that proved innocence!

8.   The prosecutor knew M.M.M. fabricated the abuse and refused to accept her as a witness during the 1994 hung jury trial or the 1996 trial that resulted in a conviction.

9.   How could M.M.M.'s date be wrong by at least 8 years as Levine's office was first opened in 1978 when she was age 20?

10.   Why would M.M.M. state there was no abuse during three (3) visits from 1978 to 1983 if the biased judge was correct that she confused the dates and the judge believed she was abused in 1978 revealing absurd and unconscionable court bias?

11.   M.M.M. spread rumors for 4½ years from 1983 that Levine abused her at age 12, as she then knew Levine from several visits to help a conspiracy, but never met Levine in 1970.

12.   Ann Renaud, Esq. contacted M.M.M. to be a witness to support Ms. Renaud's legal secretary, M.C., in the conspiracy to harm Levine.

13.   Catherine McGlynn Rizk (C.M.R.) the older sister of M.M.M. filed a false criminal claim for revenge in 1990 to help her sister who also filed a claim in 1990, although the prosecutor refused to use M.M.M. as a witness.

14.  At the 1994 first trial the prosecutor voluntarily dismissed C.M.R.'s claim when M.M.M. was subpoenaed as a defense witness to reveal her false claim and her sister's revenge.

15.  Besides M.M.M's rumors, there were two other women who spread false rumors heard by Ann Renaud, Esq. who planned a conspiracy to reap millions in a malpractice case and to rid the area of an alleged abusive doctor!

16.  Joanne Arena (J.A.), a disgruntled patient claimed she had a pelvic exam with Levine for vaginal bleeding with a nurse present after passing a large clot that was sent for analysis to look for evidence of conception.

17.  J.A. stated Levine failed to make a diagnosis causing her to see a gynecologist who also could not make a diagnosis a month later, but sent her to a hospital where an exploratory operation discovered a tubal pregnancy.

18.  Such pregnancies are rare and are caused by pelvic infections usually related to multiple partners by her or her husband, causing her ovary and tube to be removed!

19.  J.A. who owned a beauty shop began spreading rumors that Levine did a second pelvic exam without a nurse at the same exam looking for a "tail" that would mean Levine was incompetent and adding that he placed her hand on his penis through clothing.

20.  J.A. stated, "It dawned on me that he didn't examine me, he really 'got off on my blood', which was dripping on my feet."

21.  Her statement that he didn't examine me proves there was no second pelvic exam, as she fabricated a second pelvic exam and contact with a penis for revenge for the loss of her ovary!

22.  If J.A. was dripping blood, how was she able to remain at home for a month before visiting a Gynecologist?

23.  If Levine 'got off on her blood', which he did not, why would he place her hand on his penis through clothing to 'get off' again, especially when he was impotent due to medication for high blood pressure and prostate disease for many years?

24.  J.A. is a disgruntled person who lost her tube and ovary and spread rumors to every beauty shop client who would listen that was also heard by Ann Renaud and her legal secretary, Mary Carroll (M.C.) who filed a suit for millions.

25.  J.A.'s beauty shop was in the Monmouth Junction section of South Brunswick where sexual rumors against Levine occurred.

26.  Another legal secretary, Katherine McGrath Gilbert (K.M.G.), visited Levine for birth control pills and had many pelvic exams with a nurse present.

27.  K.M.G. claimed she felt sexually uncomfortable with the exams and spread such rumors to another legal secretary that allowed M.C. to falsely remember the alleged repressed abuse!

28.  A repressed memory cannot be recovered by talking with a legal secretary and is typical of the "False Memory Syndrome".

29. The three women spreading rumors caused many to hear that Levine sexually abused women.

30. Ann Renaud, Esq. and M.C. heard the rumors and devised a plan to reap millions of dollars for alleged sexual abuse.

31. M.C. had a trusted doctor, but she used a guise of having pneumonia to visit Levine to get a chest x-ray, which equipment her doctor did not have.

32. M.C. made a miraculous recovery from alleged pneumonia the next day, as her chest x-ray showed no pneumonia, as her husband testified she only had a cold!

33. M.C. said she left Levine's office knowing nothing wrong occurred, but claimed she lost her memory of the September 6, 1988 visit, as she repressed the false alleged abuse.

34. Without psychiatric therapy M.C. said she was able to write a letter to her boss, Ann Renaud, Esq., with all the details of the alleged abuse three (3) months after the visit even after claiming she had repressed the alleged abuse.

35. When asked how she was able to write the alleged abuse if she had repressed it, she said, "I don't know."

36. She then claimed she repressed the alleged abuse again for another 15 months until her legal secretary friend told her that K.M.G. alleged being sexually uncomfortable with exams.

37. Alleged abuse cannot be repressed a second time without more trauma!

38.  Eighteen (18) months after her visit M.C. along with K.M.G. and Sheri Perl (S.P.) filed criminal claims 3 days apart in March 1990 although their visits were months to years apart, as proof of a conspiracy to harm Levine.

39.  Levine was arrested in July 1990 after the State's investigation, but during the 18 months of repressed memory seven more women made strange visits saying they were also abused, as M.C. purposely did not file a complaint of sexual abuse during the 18 months and all filed strange claims.

40.  Those seven women were told not to file claims until after the State's investigation and after Levine's arrest so that the claims if filed at about the same time as the original three claims would not appear to be a conspiracy.

41.  Psychiatrists from Harvard Medical School and Johns Hopkins Medical Hospital did research on repressed memory, finding that M.C.'s memory loss alleged to be from the shock of the alleged abuse was actually the "False Memory Syndrome".

42.  A repressed memory from a shock is not recovered by Ms. Renaud asking M.C. to write all the allegations from her visit to Levine three (3) months after the visit without prolonged professional therapy.

33.  Instead of M.C. and Ms. Renaud filing a criminal claim three (3) months after M.C.'s visit having all the false alleged claims of abuse by using a guise instead of visiting her trusted

physician, M.C. claimed she repressed her memory of the alleged abuse again for another 15 months without any new trauma.

34.   That 15 months of false memory loss allowed seven (7) more women to visit Levine to claim abuse to support M.C.'s claims of alleged abuse for her lawyer, Ms. Renaud, a previous prosecutor, believing conviction would be easy with many women.

35.   M.C.'s memory loss and recovery after three months followed by another loss of memory is called the "False Memory Syndrome", used for personal gain such as huge financial awards.

36.   The "False Memory Syndrome" was defined by Mark Twain saying, "When I was young I could remember everything, whether it happened or not."

37.   The "False Memory Syndrome" has been used mainly by women who are linked to the feminist movement to harm men and to reap huge financial gains.

38.   The judges of New Jersey have supported women's claims against men by saying, "If the women say it occurred we must believe them."

39.   The judges failed to allow the alleged false acts to be demonstrated so that the jury could see the imagined alleged acts, as juries have preconceived ideas of guilt in such cases and judges are especially against male physicians who are accused of sexual acts!

40.   In the case of Princeton Insurance Company v. Dr. Chungmuang, the Princeton Malpractice insurer refused to defend the gynecologist Dr. Chungmuang who examined a virgin who visited him for her first Pap smear exam when she claimed abuse, as the doctor twisted his fingers inside her and she felt dirty.

41.   The Appellate New Jersey Justice affirmed the conviction by saying, "If the woman believed she was abused, we must believe her," but, the Justice failed to know how a pelvic exam was performed and failed to ask an expert for help.

42.   The pelvic exam is performed by keeping the index and middle fingers together in a vertical position to easily enter the vagina while the woman is lying on the exam table with her legs in the stirrups.  Once inserted the two fingers are turned (twisted) to the horizontal position with one finger placed on one side of the cervix and the other finger placed on the other side allowing the two fingers to gently lift upward to raise the uterus toward the doctor's other examining hand so he can feel the size of the uterus between his two hands to make sure there are no growths or enlarged ovaries.

43.   The virgin was not familiar with a pelvic exam and made a false complaint, while the New Jersey Justice also failed to know about a pelvic exam, as several other women joined to also make sexual claims against this doctor to gain monetary awards!

44.   New Jersey judges refused to accept expert Psychiatric reports that prove the memory loss in this case is false!

45.   New Jersey judges do not understand psychologically false testimony.

46.   New Jersey judges do not accept the Rule Of Law by refusing to accept new evidence!

WHEREFORE, Plaintiff demands judgment against defendants to reverse an unjust conviction.

Plaintiff seeks damages for 28 years of lost income.

Plaintiff seeks sums that the Court deems just and reasonable from defendants who caused undue stress and heart damage.

## COUNT II

1.   Plaintiff includes all paragraphs of Count I and makes another claim.

2.   Diane Berry (D.B.) and Mariana Munck Sontag (M.M.S.) were friends from childhood and would tell each other everything that they experienced.

3.   M.M.S. moved from East Brunswick to Monmouth Junction, living not far from J.A. who owned a beauty shop where she spread rumors that plaintiff abused her.

4.   Knowing plaintiff from East Brunswick, it would be unusual that M.M.S. did not hear the rumors of sexual abuse that were spread by J.A. and two other women, M.M.M. and K.M.G.

5.  D.B. had been a patient of plaintiff long before M.M.S.
made a strange visit and told M.M.S. that she was sexually
uncomfortable with her last exam for surgical clearance.

6.  Why would M.M.S. make a visit for the first time with a
claim of chest pain, when she never visited plaintiff for more
than 18 years while she lived in East Brunswick where plaintiff
had an office after hearing that her best friend was sexually
uncomfortable during a visit to plaintiff?

7.  No reasonable woman would visit a doctor after hearing
that her best friend was sexually uncomfortable with him.

8.  M.M.S. used a guise of chest pain to make a visit to seek
a story of abuse in a conspiracy with D.B. to seek a huge claim.

9.  Plaintiff asked M.M.S. to visit her gynecologist to know
if her birth control pills caused clots and the chest pain!

10.  M.M.S. failed to visit her gynecologist, but returned to
Levine to claim more chest pain and abuse.

11.  Both D.B. and M.M.S. filed criminal claims, although the
ineffective defense counselor failed to know that D.B. who was
not a witness at trial had also filed a criminal claim and the
counselor did not know the two women conspired to claim abuse
with a huge malpractice claim.

12.  M.M.S. whose sexual claim was a count in the conviction
stated she sat on plaintiff's lap, but the investigator turned
off the tape and said that sitting on a lap is not sexual abuse.

13.   M.M.S. purposely fell on Levine's lap and knew that the exam was completed, as plaintiff exited the room after she fell on his lap purposely, but she added for the tape that her legs were on plaintiff's shoulders and he placed his arms between her legs and leaned forward causing his penis to hit her leg.

14.   That M.M.S. claim is physically impossible, as any leg being on his shoulder would fall off as he leaned forward so that there could not be penis contact with a leg.

15.   Neither the judges nor the jury tried to demonstrate the alleged penis contact by M.M.S. to prove it was not possible, as it was coached by Mr. Graves to help M.M.S. file a claim.

16.   Mr. Graves coached M.M.S. to say the doctor wanted her to lower her panty hose below her knees.

17.   That would make it impossible for M.M.S. to have her legs on Levine's shoulders!

18.   Therefore, M.M.S. recanted her pantyhose lowered claim and said she made a mistake, as they were at her waist.

19.   M.M.S. could not remember where on her leg there was sexual contact or on which leg the alleged contact occurred.

20.   At the second trial she added that there was sexual contact on the inner thigh of her leg, but still did not know on which leg the alleged contact occurred.

21.   M.M.S. said she and prosecutor Frank Graves were friends, as he helped her add thrusting and heavy breathing!

22. After eleven (11) years in 2001 M.M.S. and D.B. settled the malpractice claim without receiving one cent.

23. M.M.S. refused to go through a penalty trial, as she knew Levine would have her demonstrate the alleged acts and use those transcripts to reverse the conviction.

24. In 2009 three counts (three women) of the nine count conviction testified at a third trial where they were asked to demonstrate the alleged acts.

25. The jury seeing that the alleged acts were fabricated found Levine innocent in less than one hour!

26. The Public Defender refused to obtain the transcripts of the 2009 trial for the second PCR petition causing the PCR lower court to laugh at the fact that the alleged acts were not physically possible.

27. The lower PCR court and the Appellate Court refused to accept the 2009 verdict new evidence without the transcripts.

28. New Jersey judges are loath to overturn a conviction no matter how much proof of innocence exists.

WHEREFORE, plaintiff demands judgment against defendants to reverse the nine (9) count conviction.

Plaintiff also seeks sums for 28 years of lost income and ignominy from professionals and the local community.

Plaintiff asks the Court for sums it deems reasonable and just due to years of stress and severe heart disease.

## **COUNT III**

1. Plaintiff includes all paragraphs of counts I and II and makes another complaint.

2. At the 1994 first trial the testimony of Sheri Perl (S.P.) was found to be false by the plaintiff's lawyer, as she claimed she could see, using a mirror inside a dressing cubicle with the curtain opened about 15 inches, Levine standing at the sink, but he was not washing his hands.

3. S.P. testified she found a white dot on the sink counter implying that Levine used self-gratification that she claimed was the proof she needed to believe she really was abused.

4. Plaintiff's lawyer said the curtain was not opened enough for S.P. to use the mirror to see the sink and plaintiff.

5. The curtain had to be opened all the way to the sink for S.P. to see what she claimed.

6. Since the 1994 trial was a hung jury, the prosecutor asked investigators Cora Cashman and Susan Evans to perform a search of the scene to verify S.P.'s testimony.

7. Plaintiff was present during the investigators' search and knew the investigators could not verify S.P.'s testimony.

8. However, the prosecutor and investigators Cora Cashman and Susan Evans failed to provide plaintiff, the court and jury with the results of the exculpatory search.

9.   The New Jersey judges failed to demand that the prosecutor reveal the result of the exculpatory March 24, 1995 search that occurred between the 1994 and 1996 trials conducted by Cora S. Cashman, investigator and Investigator Susan Evans.

10.   The search proved S.P. was coached to lie to give Mr. Graves the element of self-gratification.

11.   Previously, S.P. told four (4) different stories of the same visit of 5/2/89 after the tape recording was stopped by the investigator who told S.P. that her claims of being held tightly was not a claim of sexual contact, causing S.P. to tell three stories before her claim was accepted.

12.   S.P. told her fourth story to her mother on the day of her visit that Levine performed a pelvic exam without a nurse present, causing her mother to write a letter to Levine confirming that lie.

13.   S.P. denied that fourth story given to her mother by saying her mother's letter claiming a pelvic exam meant that there was an abdominal exam!

14.   S.P. and her mother are sophisticated women who travel to New York City to have Pap smear exams by their New York gynecologist on a regular basis.

15.   S.P. was motivated to lie to her mother and to the jury to harm Levine, as she was not abused as revealed by her first story that she had an abdominal exam while standing that

requires one hand to support her back so she does not fall and the other hand to compress her abdomen to try to find why S.P. claimed a guise of vomiting of one month to make a visit!

16. As a patient, S.P. never waited a month with a health issue, but used that "vomiting guise" to seek abuse related to a possible pregnancy.

WHEREFORE plaintiff demands judgment against defendants to reverse the unjust conviction of 1996.

Plaintiff seeks judgment against defendants for causing an unjust loss of income for 28 years.

Plaintiff asks the Court to grant such other sanctions and penalties against defendants for coaching women to add claims to harm Levine that the Court deems just and reasonable.

## COUNT IV

1. Plaintiff includes all paragraphs of counts I, II, and III and makes another claim.

2. Dominique Gasdia (D.G.) was a 235 pound, 5'6" woman who joined Ms. Renaud in a conspiracy to harm Levine.

3. D.G. visited for a sore throat and also stated she had back pain that she wanted evaluated, as a new patient.

4. A new patient history includes asking a woman if she had ever had a Pap smear and that Levine's office is equipped to perform such tests if the woman is sexually active.

5. Mr. Graves told the jury that D.G. visited for a sore throat and Levine asked her to undergo a Pap smear to stimulate the jury into believing Levine abused patients.

6. Mr. Graves repeatedly made similar false statements to the jury and coached the women to claim Levine was breathing heavily and performed thrusting.

7. Levine was a quarter mile track runner who won the high school Middlesex County quarter mile race in 1958, as he was recruited to run track in college.

8. Levine was in good physical condition after returning from serving with the marines in the Far East during the Vietnam War for two and one half years.

9. Levine never breathed heavily during any sexual foreplay and only breathed somewhat heavily after sexual climax with his wife prior to taking medication for high blood pressure and prostate disease that caused impotence and no heavy breathing.

10. There was never any thrusting or heavy breathing during the exams of these women, as Levine was impotent.

11. Levine never asked D.G. to have a Pap smear at her first visit and no Pap smear was done.

12. D.G. claimed that while she was standing and Levine was seated she felt a penis strike the small of her back.

13. When asked how she knew a penis contacted her back when she never saw any arousal and did not see any contact, she answered, "It was the only thing that came to my mind."

14. D.G.'s answer is clear proof that she made a visit as part of the conspiracy to seek abuse!

15. It is not possible for Levine's penis to reach more than two feet from his seated position to the small of D.G.'s back through clothing and curve around her large buttocks and then bend to put pressure on her back!

16. However, Mr. Graves falsely stated Levine raised his stool to reach the small of D.G.'s back, but failed to reveal how Levine's penis could become close to her back, as her large protruding buttocks prevented Levine's stool and his body from coming anywhere near the small of her back.

17. Besides any possible erect penis would have to be along one leg through clothing and therefore the alleged contact would have to be on D.G.'s side of her buttock or back and not in the small of her back.

18. There was no erect penis and D.G. felt only the examining hand and fingers in the small of her back.

19. It is not believable how any intelligent jury could have convicted Levine of D.G.'s imagined claim alleging Levine's penis had to be two (2) feet long to reach D.G.'s back.

20. The jury had to have accumulated the alleged acts and therefore convicted on all counts without trying to determine if such alleged contact was possible.

21. The third trial in February 2009 that acquitted Levine of three counts of the nine count 1996 conviction proved that the 1996 jury failed to analyze the alleged acts that were a conspiracy, were imagined and were not physically possible!

22. One of the three women, Theresa Chartier, (T.C.) cried when she demonstrated the alleged act for the first time in 2009 causing her to realize that she was accusing an innocent man!

WHEREFORE, plaintiff demands judgment against defendants for creating false claims and requests a reversal of the conviction.

Plaintiff also asks for damages against defendants for causing a loss of income and ignominy.

Plaintiff seeks additional penalties that the Court deems just and reasonable for the 28 years of unjust suffering.

## COUNT V

1. Plaintiff includes all paragraphs of counts I, II, III and IV and makes another claim.

2. The Honorable Glenn Berman, J.S.C. who presided over the 1994 hung jury and the 1996 conviction told the prosecutor that there should be another count for M.C. of vaginal contact as the lesser included count from the acquittal of vaginal penetration, while reviewing the counts that remained from the 1994 trial!

3. Judge Berman revealed strong bias against Levine during the second trial, as the timid Public Defender failed to protect plaintiff from the frequent false statements, coaching the women and a damaging unjust charge to the jury that was a lie.

4. Sandra Y. Dick, Esq. who was the senior advisor to the State Board of Medical Examiners had a reputation of seeking fraud against doctors by reviewing the malpractice applications the doctor submitted.

5. However, Ms. Dick never investigated her false claims, as many doctors did not challenge her allegations.

6. Just prior to the second trial in April 1996 Ms. Dick gave Mr. Graves two malpractice applications that Levine submitted to Princeton Insurance Malpractice Company.

7. Ms. Dick claimed Levine committed misapplication and fraud by saying in his 1992 application that there were 4 malpractice claims and in his 1995 application saying there were no malpractice claims during the past five (5) years.

8. Ms. Dick, as usual, failed to investigate the alleged discrepancy and did not know that Princeton Insurance filed a Declaratory Action in 1993 to have the four (4) malpractice claims dismissed, as they were criminal claims excluded from the policy and that no malpractice claims existed.

9. Knowing that no malpractice claims existed, as Levine's diagnosis and treatment were correct, he agreed with Princeton's

Declaratory Action saying in the 1995 insurance application that no malpractice claims existed!

10. The court agreed and granted Princeton relief from the four (4) malpractice claims.

11. But, Judge Berman, Mr. Graves and Ms. Dick did not know the court's Declaratory Action ruling causing Mr. Graves to cross examine Levine with alleged fraud by surprise that the Public Defender also had no facts, as the two insurance applications were withheld in violation of discovery.

12. Judge Berman charged the jury saying the jury could not convict Levine for insurance fraud or misapplication, but the jury could use those facts to determine Levine's credibility.

13. The ineffective Public Defender did not know how to question Levine to find out if the alleged fraud was true and he did nothing to stop the unjust charge to the jury.

14. Judge Berman revealed strong bias against Levine, as he wanted a conviction knowing that he was being considered to be the next chief prosecutor.

15. Judge Berman was praised for presiding over Levine's conviction and given the chief prosecutor's job.

16. Withholding facts and documents from the accused until the day before a hearing or trial is a typical discovery violation of Ms. Dick so that doctors are sanctioned by the

Medical Board before they have an opportunity to defend against false allegations.

17. Mr. Graves also is known to withhold exculpatory documents and he refused to give the two malpractice applications to the Public Defender so that Levine and his lawyer could prepare for the surprise violation.

18. Mr. Graves not only withheld several other exculpatory documents (see above), but he objected to the Public Defender's questions about the medical history of the women, which Judge Berman sustained causing the Public Defender to state that he could not give Levine effective assistance of counsel, denying Levine his Sixth Amendment right, as the medical history was revealed at the first 1994 hung jury trial to justify the exam performed so that the jury only heard the alleged abuse.

19. M.C. stated Levine placed his hand inside her tight jeans and panties on her 220 pound 5'5" body and reached down to her lower abdomen to suddenly penetrate her vagina.

20. It was not possible to reach into M.C.'s tight jeans and reach down passed her pubic bone without a strong fight and M.C. stated there was no fight.

21. Levine was acquitted of M.C.'s alleged vaginal penetration, but Judge Berman encouraged Mr. Graves to have M.C. testify that there was vaginal contact.

22. If there was vaginal contact by reaching inside M.C.'s panties, then vaginal penetration would be easy.

23.  The claim of a lesser included vaginal contact is clear Double Jeopardy in violation of the Fifth Amendment rights!

24.  But, Nancy Hulett, Esq. who was the prosecutor for Mr. Frank Graves for Levine's appeals stated that Levine contacted M.C.'s vagina from outside her jeans through clothing.

25.  There was no testimony from M.C. that changed her claim to vaginal contact that was not inside her panties.

26.  Ms. Hulett, like many prosecutors, altered testimony and deceived the New Jersey Appellate Justices!

27.  The State Appellate Justices refused to address the Supremacy Clause of the U. S. Constitution for withholding exculpatory discovery, and they refused to address the violation of Fifth Amendment rights of twice being in jeopardy for vaginal contact after an acquittal of vaginal penetration, as the means by which the penetration allegedly occurred and was rejected by the jury is the means that would not allow vaginal contact.

WHEREFORE, plaintiff demands judgment against defendants for making false statements and seeks to overturn the conviction.

Plaintiff demands sanctions and penalties against defendants for violations of law that caused a loss of income for 28 years.

Plaintiff seeks further sums that the Court deems reasonable and just from defendants whose tactics are unconscionable.

DATED: October 1, 2019          Respectfully submitted,

Benjamin Levine, Pro Se, Plaintiff